*KOH*

EBP/CKD: USAO 2019R00339

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CASE NO**. **21-mj-2012-TJS** |
| | * | |
| **v.** | * | **CASE NO. 21-mj-2013-TJS** |
| | * | |
| **PATRICK NWAOKWU,** | * | **CASE NO. 21-mj-2014-TJS** |
| **MUSA BANGURA, and** | * | |
| **JOHANAH NAPOLEON,** | * | **FILED UNDER SEAL** |
| | * | |
| **Defendants** | * | |
| | * | |

**\*\*\*\*\*\*\***

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND ARREST WARRANTS

I, Daniel Rzepecki, a Special Agent with the Federal Bureau of Investigation ("FBI") in Baltimore, Maryland, being duly sworn, deposes and states the following:

### Introduction

1.      This affidavit is submitted in support of a criminal complaint and arrest warrant charging **PATRICK NWAOKWU ("NWAOKWU"), MUSA BANGURA ("BANGURA"),** and **JOHANAH NAPOLEON,** with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit false statements relating to health care matters, in violation of 18 U.S.C. § 371; and false statements relating to health care matters, in violation of 18 U.S.C. § 1035.

2.      As set forth below, there is probable cause to believe that **NWAOKWU, BANGURA, NAPOLEON,** and others have conspired to commit heath care fraud and false statements relating to health care matters, and have submitted false statements relating to health care matters by working together to sell fraudulent transcripts and diplomas that indicate that various individuals completed necessary courses and clinical hours to obtain nursing degrees. In

addition, **NWAOKWU** and his associates coached these otherwise unqualified individuals to pass the nursing board exam. A number of these unqualified individuals subsequently obtained employment at various healthcare providers in the District of Maryland. As set forth below, those healthcare providers accepted private insurance, Medicare, and Medicaid.

3.      Your affiant is a Special Agent with the FBI.  Your affiant has been so employed since June 2008, during which time your Affiant has been assigned to the Washington Field Office, Baltimore Field Office, and FBI Headquarters. Your affiant is currently assigned to a complex financial crimes squad. Your affiant has received instruction and training, and gained investigative experience, in bank fraud, financial institution fraud, health care fraud, corporate fraud, and money laundering.  In the course of conducting or participating in criminal investigations, your affiant has been involved in interviewing and debriefing witnesses and informants; conducting physical surveillance; analyzing bank records and other financial documents; analyzing telephone records; collecting and analyzing evidence; and preparing and executing search warrants.

4.      Your affiant has personally participated in this investigation and has witnessed many of the facts and circumstances described herein. Your affiant has also received information from other law enforcement officers and representatives of Business 1 relating to this investigation. The information set forth in this affidavit is based on your affiant's own observations and review of documents, or reliable information provided to your affiant by other law enforcement personnel. Your affiant sets forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested arrest warrant. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

### **Nursing Background**

5.      Nursing is the largest healthcare profession in the United States. In 2017, for instance, there were more than 4,015,250 registered nurses, and 922,196 nurses nationwide.[1] Nurses comprise the largest single component of hospital staff, are the primary providers of hospital patient care, and deliver most of the nation's long-term care.

6.      In the United States, each individual state has its own laws, rules, and regulations governing nursing care. There are no federal regulations for nursing as they are addressed by each state's nursing board. Typically, each state's board of nursing governs the making and administration of the nursing rules within a particular state. In some states, the term "nurse" can only be used in conjunction with the practice of a registered nurse ("RN"), or a licensed practical nurse ("LPN").  RNs provide direct care to patients, while LPNs typically provide assistance to doctors or RNs. RNs take on a management role and are responsible for overseeing LPNs and other healthcare aides. In a hospital setting, RNs will often delegate tasks to LPNs. RNs are more involved in administering medications, treating patients, creating and coordinating care plans, and work closely with doctors to ensure optimal outcomes.

7.      According to the National Council of State Boards of Nursing, there are certain general components to becoming a nurse: 1) verification of graduation from an approved pre-licensure LPN or RN nursing program; 2) verification of successful completion of the National Council Licensure Examination ("NCLEX"), often referred to as "the boards," and 3) any additional requirements imposed by the state.

---

[1] The U.S. Nursing Workforce in 2018 and Beyond. Journal of Nursing Regulation, Volume 8, Issue 4, S3 - S6.

8.      There are three primary paths to becoming an RN: (1) obtaining a Bachelor of Science in nursing, which takes four years to complete; (2) obtaining an Associate Degree in Nursing, which takes two to three years to complete; or (3) obtaining a Nursing Diploma or Certificate, which takes one to two years to complete.  In order to become an RN, a Bachelor of Science in nursing, an associate's degree in nursing, or a diploma from an approved nursing program is required.

9.      LPN training programs are typically one to two years long. A high school diploma is required, and typically a one-year certificate program must be completed. LPNs are directly involved in providing basic patient care and ensuring patients are comfortable and well cared for. At times LPNs administer certain medications and perform other duties, such as taking blood pressure and recording other vital signs.

10.     After graduating from nursing school an individual must take the appropriate NCLEXto receive a nursing license. A nursing license gives the individual permission to practice nursing, granted by the state where they meet the requirements. Since 1982, the NCLEX has been the nationwide examination for the licensing of nurses in the United States. The NCLEX is developed by the National Council of State Boards of Nursing, Inc., which administers the examinations on behalf of the various state boards of nursing in the United States. There are two types: the NCLEX-RN for registered nurses, and the NCLEX-PN for practical nurses.

11.     The Nursing Licensure Compact ("NLC") provides a multistate license that allows nurses to practice with patients across state lines. In other words, the NLC allows nurses to have one license to practice in multiple states.  In order to apply for a multi-state license, an individual must 1) reside in an NLC state and declare the NLC state as their primary state of residence; 2) be actively registered as an RN or LPN; and 3) meet any requirements for licensure held by the home

state and the patient's home state. Currently, there are 34 states which have enacted NLC legislation, meaning they recognize the multi-state license. Maryland, Virginia, and Florida are NLC states. Therefore, if the requirements are met, an individual could receive his nursing license in Virginia or Florida and work in Maryland.

12.     Each state's nursing board also governs the approval of nursing education programs. Privately owned nursing schools are permitted in Virginia. However, in Maryland they are not. If a nursing school is disciplined by the state's board of nursing there is a formal process in place to document the situation, action, and result. If the violation(s) are serious enough, the state nursing board can withdraw the nursing school's approval and close the education program. If the program is closed, typically the school is allowed to teach out their current student population for up to a certain number of years. Enrollment of new students is prohibited. In Maryland, nursing students cannot attend privately-owned nursing schools. If an individual in Maryland wants to be an LPN, he can attend a community college. If he wants to be an RN, he can attend community college or a four-year university. If he wants to be an advanced practice nurse, he must attend a four-year university.

13.     According to the Commission on Collegiate Nursing Education ("CCNE"), an autonomous "nursing education accrediting agency as recognized by the U.S. Department of Education, clinical practice experiences are planned learning activities in nursing practice that allow students to understand, perform, and refine professional competencies at the appropriate program level. CCNE requires all nursing degree programs to include appropriate clinical practice experiences, considering the roles or areas for which students are being prepared.[2]

---

[2] https://www.aacnnursing.org/Portals/42/CCNE/PDF/Clinical-Practice-FAQs.pdf

14.     In June 2018, the Maryland Board changed the way it approved its licenses by implementing additional checks to eliminate fraudulent activity. Presently, the Maryland Board will receive a list of potential out-of-state LPN applicants from the dean of the applicant's nursing program. Once a student graduates, he will apply to the Maryland Board for a state LPN license. The applicant is responsible for forwarding his application and transcripts to the Maryland Board. Once the Maryland Board receives the application, the Maryland Board issues a checklist to the nursing school to verify that the application and transcripts are legitimate. Out-of-state nursing schools are responsible for sending the required supporting documents before any graduates can be approved for licensing. Further, the applicant must provide the school director's email address so the director can verify the applicant's identity. After the changes the Maryland Board made in June 2018, applicants cannot take the NCLEX examination until all their paperwork is complete and their school completes the Maryland Board checklist. The Maryland Board advised your affiant the required documentation should be readily available from a legitimate nursing program.

**Probable Cause**

15.     The FBI investigation was initiated on information indicating two individuals were creating illegitimate LPN transcripts and certificates through a nursing school in northern Virginia. Throughout the course of the investigation your affiant and other FBI agents utilized various investigative techniques, including a confidential human source and an undercover FBI agent, to purchase two illegitimate registered nursing degrees. The undercover operations make it clear that the purpose of the scheme is to provide paying individuals who are otherwise untrained and unqualified to work as nurses with the necessary documentation so that these individuals can become licensed RNs or LPNs and obtain employment in the healthcare industry.

16.     In March 2019, the FBI received information from a confidential witness ("CW1"),[3] who stated that **NWAOKWU** and **BANGURA** were creating illegitimate LPN transcripts and certificates through a privately-owned nursing school ("**Nursing School 1")** in northern Virginia.[4] CW1 provided this information to the FBI as a complainant. He did not further participate in the investigation.

17.     As discussed in this affidavit, from August 8, 2008 to June 30, 2013, **Nursing School 1** was a nursing school in Virginia until it was shut down for violating certain state regulations by the Virginia Board. After that time, **NWAOKWU** and **BANGURA** continued to illegitimately operate **Nursing School 1** as a place where people could go to simply purchase illegitimate LPN transcripts and certifications that are backdated to June 30, 2013.

18.     On April 14, 2019, your affiant interviewed CW1, who advised that CW1's cousin had approached CW1 and asked to borrow up to $15,000 to purchase a fake LPN transcript and certification from **Nursing School 1**.

19.     According to CW1, **Nursing School 1**—which CW1 stated was located in Northern Virginia—certified LPNs, even though it had closed in 2013.

20.     Records obtained from the Virginia Board of Nursing ("Virginia Board") confirmed that **BANGURA** owned and operated **Nursing School 1** and that **NWAOKWU** may have been an instructor at **Nursing School 1** for an unknown period of time.

---

[3] In 2004, CW1 was arrested in Pennsylvania on a state charge for identify theft. CW1 was convicted of that offense and served two years of probation. The FBI has never paid CW1. For the purpose of this affidavit, confidential witnesses are referred to using male pronouns, regardless of gender. Your affiant cannot speak to CW1's motivations as your affiant only met CW1 once. The information CW1 provided was corroborated wherever possible. Your affiant found the information CW1 provided to be reliable and is unaware of CW1 providing any false information to your affiant.

[4] Originally, **Nursing School 1** was operated under one name. However, on April 14, 2010, the name was changed to another name.

21.     CW1 stated that he recently visited a home healthcare school in Washington, D.C. that **NWAOKWU** owned that was located on or near Minnesota Avenue. CW1 told the FBI that he went to the home healthcare school and pretended to be interested in purchasing an LPN certification because CW1 was curious if the scheme he heard about was real.

22.     When CW1 entered the school, CW1 asked the secretary at the front desk if the secretary could provide any proof that people were paying for LPN certificates and transcripts. The secretary showed CW1 various **Nursing School 1** "official transcripts" and handwritten receipts reflecting that people had paid for the fraudulent documents. CW1 asked if he could photograph some of the documents as proof. The secretary allowed CW1 to take the photographs on the condition that CW1 not tell **NWAOKWU** she permitted CW1 to take the photographs. CW1 photographed three "official transcripts" and five handwritten receipts. CW1 provided all the records he photographed to the FBI.

23.     CW1 stated—and the receipts reflected—that **Nursing School 1** would also provide a preparation course for the NCLEX for an additional fee.

24.     Through the course of the investigation your affiant confirmed **NWAOKWU** worked with **BANGURA** and then individuals in Florida to sell illegitimate LPN and RN degrees from **Nursing School 2**.  Your affiant learned the **Nursing School 2** was established by **NAPOLEON** in July 2016 after she purchased a nursing school and changed its name.  In May 2017 the **Nursing School 2** was shut down by the Florida Board of Nursing for a low NCLEX passing rate.  The cost of the illegitimate degrees also included several months of preparation classes solely designed to pass the NCLEX and not to provide a formal education.

25.     Records from the Virginia Board show that **Nursing School 1**'s first nursing class began on August 8, 2008, and that the Virginia Board shut down **Nursing School 1** on June 30,

8

2013 for multiple violations of Virginia Board regulations. Your affiant could not locate any additional records from Virginia's State Corporation Commission or the Virginia Board indicating that **Nursing School 1** ever legitimately reopened for business.

26.     The transcripts and certifications that **Nursing School 1**'s purported graduates have submitted to the Maryland Board appear to be backdated to 2013 or earlier, before **Nursing School 1** was shut down by the Virginia Board. For those **Nursing School 1** clients who have applied to become nurses in the recent past, this creates an obvious lapse in time from the nursing student's purported graduation date to the time the student applied to become a LPN in the State of Maryland.[5] This is an indicator of fraud.  Medical professionals do not normally wait significant periods of time (e.g., years) before applying to become practicing medical professionals.

27.     The three official transcripts obtained from CW1 indicate that **Nursing School 1** was located in Woodbridge, Virginia. Your affiant reviewed the transcripts, each of which displays **Nursing School 1**'s name, **Nursing School 1**'s logo, the Woodbridge, Virginia address, the website, and the email address for **Nursing School 1** ("the **Nursing School 1** email account").

28.     On page one, each transcript lists the courses the student has purportedly taken, the grades the student purportedly earned in four different quarters, and the dates of each quarter. For example, courses reflected in **Nursing School 1**'s transcripts are pharmacology, anatomy and physiology, medical and surgical clinical courses, pediatric nursing, and NCLEX review. Each transcript purports that the student completed 1,700 hours of nursing education before graduating from **Nursing School 1**. Notably, page one of each transcript displays **BANGURA**'S handwritten

---

[5] For example, if a medical professional applies to become a licensed nurse in 2019, but submits documentation indicating that he graduated from nursing school in 2013, there will be an inherently suspicious lapse of six years between that individual's purported graduation and his application to become a nurse.

signature.  Your affiant compared **BANGURA**'S signature on the **Nursing School 1** transcripts to signature cards for bank accounts solely-controlled by **BANGURA** or loans obtained by **BANGURA** and they appear to be very similar or the same.

29.     Page     two     of     each     transcript     appears     as     follows:



30.     The second page of the **Nursing School 1**'s official transcript purports that **Nursing School 1**'s students participated in clinical courses with a baby clinic in Washington, D.C. and several organizations in northern Virginia. From interviews your affiant conducted and records

your affiant reviewed, as set forth below, the information contained in **Nursing School 1**'s student transcripts is false.

31.    Your affiant reviewed records from the Virginia Board that show **Nursing School 1** had an affiliation agreement with a nursing home in Arlington, Virginia, dated and signed in October 2010. On February 14, 2020, Manor Care's associate general counsel confirmed Manor Care could not locate any records or contracts relating to **Nursing School 1**, although this could be because of the amount of time that has elapsed since 2010.

32.    Your affiant reviewed records from the Virginia Board that show **Nursing School 1** had an affiliation agreement with a nursing home in Oakton, Virginia that was signed in January 2010. In August 2011, in a Virginia Board of Nursing Compliance Report related to **Nursing School 1**, the nursing home's executive director reported, to the best of his recollection, that **Nursing School 1** students were at the nursing home in October and November 2010 only, and not in 2011 as reflected in the fraudulent **Nursing School 1** transcripts.

33.    Your affiant reviewed records from the Virginia Board that show **Nursing School 1** had an affiliation agreement with a a medical corporation signed in July 2011. On February 6, 2020, your affiant spoke with the general counsel, who advised that she spoke with the administrator of the corporation's Burke location. The Burke administrator could not recall ever hosting **Nursing School 1** students. The general counsel also spoke with the administrator of the Cherrydale, Arlington location, who could only recall hosting **Nursing School 1** nurses one time. This administrator also disclosed that he felt something was "off" with the **Nursing School 1** students.

34.    Your affiant thereafter reviewed five handwritten receipts that displayed the signatures of **NWAOKWU** and the purchasers of the documents. The additional receipts show

11

that the **Nursing School 1** students were paying between $6,000 and $18,000 for the illegitimate transcripts and certificates.

35.     On August 8, 2019, your affiant conducted surveillance at the address in Woodbridge, Virginia reflected on **Nursing School 1**'s fraudulent transcripts to determine if **Nursing School 1** maintains a physical presence. Your affiant found the location was maintained by an unrelated entity.

36.     Your affiant spoke with the manager of the facility and learned that **Nursing School 1** was previously located at the address, but had moved to a different address located in the same business park in an adjacent building, and changed their name.  Currently, **BANGURA** operates a home health care school  (**"Home Health Care School 1"**). At the time of the interview, **Nursing School 1** and **Home Health Care School 1** both still received mail at the old location. According to the facilities manager, **BANGURA** routinely calls the new tenant of the old address to inquire about mail delivered for **Nursing School 1**.

37.     **Home Health Care School 1** was incorporated in Virginia in March 2012, and **BANGURA** is currently the registered agent.

### *Maryland Board of Nursing*

38.     Approximately 175 **Nursing School 1** graduates have applied to the Maryland Board of Nursing for licenses for the time period August 2012 through July 2019.  Additionally, there are approximately 62 active LPNs working in the State of Maryland at the time the records were provided to the FBI.

39.     As part of this investigation, your affiant obtained lists of **Nursing School 2** graduates who had applied to take the New York State Board Examination. At least some of the individuals whose transcripts were backdated are included in this list as having passed the New

York State Board Examination. Based on my training and experience, I know that some of these individuals are likely working in medical facilities, under false pretenses, under whose provider numbers claims are being submitted to healthcare benefits programs. For example, Individual A received an RN from **Nursing School 2** Individual A is a licensed RN in New York and Virginia and is employed with Health Care Provider 1 in Baltimore, Maryland. Health Care Provider 1 accepts Medicare and Medicaid. Similarly, Individual B received an RN degree from **Nursing School 2**. Individual B is a licensed RN/LPN in New York and a licensed LPN in Maryland. Individual B is employed at Health Care Provider 2 in Charlotte Hall, Maryland. Health Care Provider 2 accepts Medicare and Medicaid.

40.     Since June 2018, no **Nursing School 1** graduate applying to practice in Maryland has been approved because **NWAOKWU** or **BANGURA** have failed to provide the necessary paperwork required by the Maryland Board for out-of-state applicants. Your affiant believes **Nursing School 1**'s failure to provide this routine information to the Maryland Board is an indication that **Nursing School 1**'s nursing program was committing fraud. As explained above, when Maryland Board of Nursing implemented new standards aimed at reducing fraud, **Nursing School 1** was unable to meet the Board's new requirements. An out-of-state nursing school that was running a legitimate program would have easily been able to send the Maryland Board the required supporting documents so that its graduates could be approved for licensing. The fact that **Nursing School 1** could not meet the Board's new requirements is an additional indication of fraud.

41.     The Maryland Board has provided your affiant information regarding out-of-state nursing applicants from **Nursing School 1** who met Maryland standards prior to June 2018.[6]

---

[6] In other words, non-Maryland residents who attended **Nursing School 1.**

Among the information provided by the applicant is the school director's email, which is the email address that the Maryland Board contacts to confirm the applicant's identity.

42.     Analysis of the spreadsheet shows the following:

| Director Email Address | Number of Applicants Verified | Date Range of Verifications |
|---|---|---|
| **BANGURA**'S email account | 70 | 7/19/16 to 8/15/18 |
| **Nursing School 1** email account | 25 | 12/17/16 to 8/22/18 |

43.     The Maryland Board spreadsheet listed 111 applicants. Of the 111 applicants, 95 applicants reported that the Maryland Board should contact **BANGURA**'S email or the **Nursing School 1** email account to verify their identities.

### *Virginia Board of Nursing Complaints*

44.     Your affiant learned that **Nursing School 1** had complaints regarding its program even before the Virginia Board withdrew **Nursing School 1**'s approval to operate in 2013.

45.     In October and November 2009, the Virginia Board received complaints from **Nursing School 1** students detailing their concerns about the absence of clinical experience in their program and the failure of the program director to release requested transcripts.

46.     Based on documentation reviewed and comments received during the Virginia Board's Education Informal Conference Committee meeting on March 2, 2010, the Virginia Board found the following:

- Six graduates of **Nursing School 1**'s practical nursing education program did not complete the clinical experiences in "OB, Pediatrics, and Mental Health" prior to graduation in October 2009.

- Final transcripts were submitted to the Virginia Board indicating that all classroom and clinical course had been completed, when in fact six graduates of the program were required to return after graduation to complete additional testing and clinical hours.

14

- Six graduates of the program did not receive at least 400 hours of direct client care experience prior to graduation.

47.     In a Virginia Board Consent Order dated July 21, 2010, **BANGURA** acknowledged such conduct was inappropriate and expressed regret for his lapse of good judgement. **BANGURA** also signed the consent order.

48.     As a consequence of the investigation, the Virginia Board ordered that **Nursing School 1** be placed on conditional approval for not less than one year subject to a list of terms and conditions that prevented **Nursing School 1** from operating without closer supervision from the Virginia Board. Any violation of the terms and conditions stated in the order was sufficient reason to permanently close **Nursing School 1**, as documented in the Virginia Board's Report of Compliance from August 2011.

49.     On July 18, 2008, **Nursing School 1** received a provisional approval by the Virginia Board of Nursing to operate a practice nursing education program.  In July 2010, the Virginia Board placed **Nursing School 1** on a Conditional Provisional Approval for not less than one year based on findings  that students had not completed all required clinical experiences prior to graduating and that **Nursing School 1** had submitted final transcripts to the board indicating all such clinical experience had been provided.  In May 2012 the Virginia Board of Nursing and **BANGURA** agreed to a Consent Order to withdraw **Nursing School 1's** approval to operate in Virginia.  **Nursing School 1** violated 18 VAC 90-20-151(A) of the Board of Nursing Regulations in that **Nursing School 1's** NCLEX LPN pass rates for first-time test takers has been less than 80% since initial approval.[7]  The Consent Order was based on **Nursing School 1's** low NCLEX

---

[7] 18 VAC 90-27-210 governs passage rate on the NCLEX. It reads "[f]or the purpose of continued approval by the board, a nursing education program shall maintain a passage rate for first-time test takers on the NCLEX that is not less than 80% calculated on the cumulative results

passing rates of 75.93% in 2010 and 42.6% in 2011. The Virginia Board also found numerous deficiencies in **Nursing School 1's** operations relating to the organizational plan, faculty's involvement in formulating the program's philosophy, licensure and competence of faculty members, student files, curriculum, and clinical experience.

### *Information from Individual 1, a Nursing School 1 Graduate*

50.     On February 6, 2020, your affiant interviewed an individual who purportedly graduated from **Nursing School 1** ("Individual 1") in 2013 at his residence in Prince George's County, Maryland.[8] Individual 1's application is in pending status with the Maryland Board of Nursing.

51.     Individual 1 initially attempted to lie about his experience at **Nursing School 1**, but your affiant showed Individual 1 a copy of his handwritten receipt from **Nursing School 1**. This receipt was obtained from CW1. The receipt lists Individual 1's name, date of birth, social security number, phone number, address, and a basic account balance for a "package." According to the receipt, on October 14, 2016, Individual 1 paid $3,000 towards the balance. The receipt further reflects that on March 10, 2017, Individual 1 paid another $1,000 to **Nursing School 1**. Individual 1 identified his signature on the document and confirmed the other signature on the receipt was **NWAOKWU'S**.

---

of the past four quarters of all graduates in each calendar year regardless of where the graduate is seeking licensure." The Virginia Code also provides nursing programs opportunities for remediation: "If an approved program falls below 80% for one year, it shall submit a plan of correction to the board. If an approved program falls below 80% for two consecutive years, the board shall place the program on conditional approval with terms and conditions, require the program to submit a plan of correction, and conduct a site visit. Prior to the conduct of such a visit, the program shall submit the fee for a site visit for the NCLEX passage rate as required by 18VAC90-27-20. If a program falls below 80% for three consecutive years, the board may withdraw program approval."

[8] For the purpose of this affidavit, Individual 1 is referred to using male pronouns, regardless of gender.

52.     Individual 1 stated that a friend introduced Individual 1 to **NWAOKWU**. Individual 1 admitted that he agreed to pay **NWAOKWU** $7,000 for an illegitimate official transcript, LPN certificate, and weekly NCLEX preparation sessions at **NWAOKWU**'S home health school in Washington, D.C. Individual 1 admitted that he did not attend any of the classes or complete any of the clinical work listed on his official transcript.

53.     Further, Individual 1 stated that "many" people have participated in this fraudulent scheme and that he saw new people at every NCLEX preparation session he attended. Finally, Individual 1 admitted that he never met **BANGURA**. According to records from the Maryland Board, as the owner/operator of **Nursing School 1**, **BANGURA** verified each student's identity with the Maryland Board. Individual 1 never successfully passed the NCLEX and is not working as an LPN.

### *Confidential Source 1 Purchases RN Degree through NWAOKWU*

54.     In April 2020, at the direction of the FBI, Individual 1 telephonically introduced Confidential Source 1 ("CS1") to **NWAOKWU**.

55.     CS1 originally began working with the FBI because he was a victim of an identity theft scheme perpetrated by his sibling.  Through the course of his interactions with the FBI, CS1 decided to become a confidential source and assist law enforcement anyway possible.  Your affiant has no knowledge of CS1 ever making materially false statements to law enforcement.

56.     On June 18, 2020, CS1 met **NWAOKWU** in person for the first time to discuss the process of obtaining a nursing degree and license. Throughout the meeting, CS1 wore an audio and video recording device.

57.     During the meeting **NWAOKWU** told CS1 he has been very busy because he opened a restaurant and has a "school in D.C."  **NWAOKWU** mentioned how he had a certificate

for a student who was recently deceased, but she had not finished paying for it so **NWAOKWU** had not provided it to her.  **NWAOKWU** retrieved the certificate from his desk and showed it to CS1.  The conversation turned to CS1 asking **NWAOKWU** for his help because he wants to take classes.  **NWAOKWU** asked if CS1 was an LPN and CS1 answered, "No, I want to transition into health care."   **NWAOKWU** stated he does "classes here" at a Laurel, Maryland office building, but the actual nursing school is in Florida and he is affiliated with them.  **NWAOKWU** explained he conducts the classes in Maryland, but the certificate will come from Florida.  The classes last five months "and you're good to go."  He went on to say, "for RN its 17 for LPN its 10."  Your affiant knows **NWAOKWU** was saying it will cost $17,000 to purchase an RN degree and $10,000 to purchase an LPN degree.  **NWAOKWU** advised that CS1 could choose either path.  CS1 responded he would like to do "sharp sharp"[9] now.  **NWAOWKU** responded, "everyone wants to… who wants to remain in school for three years?"  **NWAOWKU** added, "this is a legit way to get it, a legit way.  I've helped a whole lot of people."

58.    **NWAOWKU** stated he has classes taking place every Friday from 4pm-8pm, Saturday from 10am-2pm, and Sunday from 4pm-8pm.  Your affiant later learned the classes take place at  an office building in Laurel, Maryland on the 4th floor.  **NWAOKWU** stated he was trying to find an instructor to teach classes Monday through Wednesday.  **NWAOKWU** stated, the "cost is for five months and you're done, sharp sharp."  **NWAOKWU** then advised CS1 he must take and pass the board exam to use his degree in the health care field.  **NWAOKWU** advised the certificate only qualified him to take the board exam.  **NWAOKWU** added that the school in Florida would back date the certificate because if you went the legitimate route it usually takes two years to complete the LPN degree and three years for the RN degree.  **NWAOKWU** stated

---

[9] CS1 confirmed "sharp sharp" is Nigerian slang for doing something quickly.

the school in Florida really cares about each student being able to pass the board.  Your affiant learned through the course of the investigation it is important to nursing schools that students pass the board exam.  An overall low NCLEX passing rate of graduates will cause the state's nursing board to discipline the schools or shut them down.

59.     **NWAOKWU** continued, saying that the classes for the LPN and RN are the same, but if you have the money you should do the RN.  **NWAOKWU** continued to say if CS1 decided to make a payment plan arrangement, then the "package" will not be released until full payment was made.  "If you want to go through the regular school system for RN you'll go to school for two or three years…for the main program, two or three years.   But this is just for helping, helping my people."

60.     On July 6, 2020, CS1 met with **NWAOKWU** to make an $8,500 down payment for the illegitimate RN degree. Throughout the meeting, CS1 wore an audio and video recording device.   At the beginning of the meeting CS1 asked **NWAOKWU**, "What do you need from me to start?"  **NWAOKWU** responded, "Money!"  **NWAOKWU** went on to say that he would give CS1 a receipt and if for any reason CS1 does not get his certificate he would give CS1's money back.  **NWAOKWU** added, "this school closed, but we will back date everything, right?"  **NWAOKWU** then provided CS1 with the following forms to complete with instructions:

- NY State Nurse Form 1, Application for Licensure and Nurse Form 2, Certification of Professional Education:  **NWAOKWU** advised on Nurse Form 1, CS1 should fill in dates because it is appropriate to have dates from a recent time frame.  Also, anywhere it requires the name of the nursing school he should use the **Nursing School 2**.  **NWAOKWU** advised on Nurse Form 2 to only fill out the first page.  Page two would be filled out in Florida.  **NWAOKWU** instructed to leave the date blank on page two because they will fill it out in Florida.  **NWAOKWU** advised he needed $143 from CS1 for his application with the New York Board of Nursing.  **NWAOKWU** explained Maryland does not allow out of state nursing schools to take the board exam.  Therefore, CS1 will get his nursing license through the state of New York and can then use the New York license to practice in any state he chose.

19

- <u>Florida Department of Law Enforcement Criminal Justice Information Services Division/User Services Bureau Form B (fingerprinting form)</u>:  No specific instructions were provided for this form.

- **<u>Nursing School 2</u>** application forms:  **NWAOKWU** instructed CS1 not to fill in any dates on this form because everything will be backdated by Florida, so it would appear as though CS1 was part of a previous graduating class from December 2019, which was the last graduating class of the **Nursing School 2**.

61.     Your affiant spoke with a New York State Office of Professions employee who advised their internal license procedure is fraught with disorganization.  It is unknown to your affiant why **NWAOKWU** has advised all of his co-conspirators to apply for a license in New York.

62.     During the July 6, 2020 conversation with CS1 **NWAOKWU** asked, "You'll come to class, right?"  CS1 responded, "I want to take a couple of classes, so I'll come to class every now and then."  **NWAOKWU** added there are classes taking place now at an office building in Laurel, Maryland  that CS1 could participate in, but the next class session has not yet started. **NWAOKWU** then stated, "If you give your money, you'll get your board."  Your affiant believes this means that if you pay **NWAOKWU** $17,000 for the RN degree he will provide CS1 with everything he needs to take the NCLEX.  **NWAOKWU** asked where in Nigeria CS1 was from. When CS1 responded, "Igbu," **NWAOKWU** replied, "That's why you're going into nursing." **NWAOKWU** added, "You have a rare opportunity."  CS1 asked **NWAOKWU**, "So when I pay the balance, then you give me the certificate and everything?"  **NWAOKWU** responded, "Package is delivered."  He went on to say that he must send "information" to the **Nursing School 2** for six other people.  When CS1 asked about class size **NWAOKWU** avoided the question. CS1 stated, "When I'm ready I move sharp sharp."  **NWAOKWU** responded, "Like I covered, this is a very rare opportunity."

63.     In July 2016 a known nursing school changed its name to the **Nursing School 2.** In April 2016, **NAPOLEON** registered the school in the State of Florida.  In April 2017 the Florida Board of Nursing terminated the **Nursing School 2** but allowed the school to teach-out their students for up to three years.  They could not enroll or accept any new students into the RN Program.  The school was terminated due to low graduate passing rates on the NCLEX.  Your affiant believes the low NCLEX passing rates are evidence of the illegitimacy of the **Nursing School 2** and the "students" enrolled there.

64.     **NWAOKWU** also informed CS1 the State of New York required CS1 to complete two online courses, but if CS1 did not want to complete the courses, CS1 could pay **NWAOKWU** $150 for an unspecified individual in Florida to take the courses on CS1's behalf.   **NWAOKWU** advised CS1 to personally take the courses himself because they will help CS1 pass the NCLEX.

65.     At this point in the meeting **NWAOKWU** began counting the $8,500 down payment.  While counting the payment the class schedule was discussed and **NWAOKWU** advised classes take place at an office building in Laurely, Maryland in Suite 402.  Based on reviewing the recorded meetings between CS1 and **NWAOKWU** your affiant believes suite 102 is the main office containing offices, computers, "student" files, and business records.  Additionally, your affiant believes suite 402 is more like a classroom setting.

66.     On August 18, 2020, CS1 met with **NWAOKWU** to pay (1) the remaining $8,500 balance for the fraudulent RN degree, (2) $150 for someone in Florida to take the two required online courses, and (3) $143 for the State of New York RN application fee. Throughout the meeting, CS1 wore an audio and video recording device. The meeting started with **NWAOKWU** asking CS1 if he completed the "exam."  CS1 responded by saying, "No, we discussed this now, you said somebody…" **NWAOKWU** acknowledged he told CS1 that someone else could take it

for him.  Then **NWAOKWU** began reviewing the completed forms CS1 returned.  All forms provided to **NWAOKWU** were completed by your affiant.  Your affiant initially listed the dates of the CS1's school attendance incorrectly.  **NWAOKWU** noticed the dates could not have been correct.  CS1 and **NWAOKWU** had a conversation about the correct dates and CS1 corrected the dates in front of **NWAOKWU**.

67.     During this meeting CS1 gave **NWAOKWU** $143, provided by the FBI, to pay for the New York Board of Nursing application fee.  CS1 also gave **NWAOKWU** $150, provided by the FBI, to pay for an unknown individual to take the continuing education courses on www. [Business 3].com.  **NWAOKWU** verified the results from Business 3, the continuing education course, will be emailed to CS1.  Next, **NWAOKWU** counted the $8,500, provided by the FBI, to verify the remaining balance was paid in full.  When CS1 asked **NWAOKWU** what the next step was, he replied, "You're on your own."  CS1 stated he saw **NWAOKWU** at a graduation ceremony for the **Nursing School 2** and another nursing school posted on www.youtube.com, which was streamed live on December 7, 2019.  Your affiant watched the graduation ceremony and observed **NAPOLEON** present **NWAOKWU** with an award and commend **NWAOKWU** on his "work" within the Nigerian community.  Later in the investigation your affiant learned CS1 "graduated" in the same class that was live streamed on December 7, 2019.  Needless to say, CS1 was not invited to and did not participate in the graduation ceremony because CS1 did not receive his degree from the **Nursing School 2** until September 11, 2020.

68.     CS1 went on to thank **NWAOKWU** for his assistance with purchasing the degree. **NWAOKWU** replied, "Trust me, with your story…any help, let me know.  Trust me… I have done it for people even… and you're smart."  They went on to discuss an upcoming NCLEX test preparation class offered by **NWAOKWU**.  Referring to the classes, **NWAOKWU** advised, "You

have to come.  Your class has not started but start coming now."  **NWAOKWU** advised CS1 that if he started to prepare now, December would be an appropriate time frame to take the nursing board exam.  **NWAOKWU** also offered the opportunity to do clinicals at his school in Washington, D.C. if CS1 had the time.  At this point **NWAOKWU** provided CS1 with a receipt for the $8,500 payment.  While the receipt was being prepared **NWAOKWU** brought up how CS1's brother saw him on Youtube.com in the **Nursing School 2** graduation ceremony receiving an "award and everything" as referenced earlier.  CS1 stated seeing the video helped his brother "calm down" and reassured him that his money was "well invested."  **NWAOKWU** replied, "The thing is too good to be real, I'm telling you."  It was part of CS1's backstory to ask and receive a financial loan from his brother to turn his life around and venture into the health care field.

69.    Two days later, on August 20, 2020, Business 3, which provides continuing education courses and certificates to nurses, emailed two continuing education certificates to an email account specifically created for this investigation and solely controlled by the FBI.  The email account was set up to accept any electronic communications sent through the course of the investigation.  The email account was created to have the appearance it was operated by CS1.

70.    On September 14, 2020, your affiant received records from Business 3 showing the continuing education courses were completed from a computer with the IP address 50.249.1.246 on August 20, 2020 at 5:01pm eastern standard time (EST).  The records also showed $34.00 was paid for the courses with a credit card ending in 9985, a transaction ID of 99fdtm74, and an authorization code of 00435D.  **NWAOKWU** maintains an active Bank of America credit card ending in 9985.  A representative from Business 3 verified they do not maintain any further records related to transactions.

71.     On September 29, 2020, your affiant received records from Comcast showing IP address 50.249.1.246 was assigned to Business 4 on August 20, 2020 at 5:01pm est.  The records indicated Business 4's address was the office building in Laurel, Maryland at which **NWAOKWU** directs students to take purported classes.  Your affiant believes **NWAOKWU** completed the online courses on behalf of CS1 for the $150 payment he received on August 18, 2020.

72.     A review of **NWAOKWU**'S financial records showed he made the following payments to Business 3**:**

| NWAOKWU Bank Account (last four only) | Date | Amount |
|---|---|---|
| 4200 | 11/21/2018 | $30.00 |
| 4200 | 01/28/2019 | $30.00 |
| 4200 | 01/28/2019 | $30.00 |
| 4200 | 01/28/2019 | $30.00 |
| 4200 | 02/04/2019 | $30.00 |
| 4200 | 02/04/2019 | $30.00 |
| 4200 | 02/07/2019 | $30.00 |
| 4200 | 02/11/2019 | $30.00 |
| 4200 | 02/16/2019 | $30.00 |
| 4200 | 03/15/2019 | $30.00 |
| 4200 | 03/18/2019 | $30.00 |
| 4200 | 03/18/2019 | $30.00 |
| 9980 | 05/29/2019 | $30.00 |
| 9980 | 07/22/2019 | $30.00 |
| 0980 | 10/07/2019 | $30.00 |

| NWAOKWU Bank Account (last four only) | Date | Amount |
|---|---|---|
| 9980 | 05/27/2020 | $34.00 |
| 9980 | 05/27/2020 | $34.00 |
| 9980 | 05/27/2020 | $34.00 |

73.     Your affiant believes **NWAOKWU** is completing the online courses required by New York State for many of his "students" to facilitate his fraud scheme.  Further review of **NWAOKWU**'S financial records show he has currently no less than seven different bank account monthly statements, business and personal, and/or loan documents mailed to his residence.

74.     On September 11, 2020, CS1 attended his first and only NCLEX test prep class in Suite 402 of an office building in Laurel, Maryland, a classroom on the 4th floor controlled by **NWAOKWU**.  Throughout the meeting, CS1 wore an audio and video recording device.  While in class, CS1 counted 10 other individuals in the classroom comprised of men and women (of wide range of ages).  The class was led by **NWAOKWU** and lasted approximately three hours.  The class began with grading a test which your affiant believes was administered in a previous class. There were 100 questions on the test.  The highest test score was a 66.  One individual commented, "That is good."  **NWAOKWU** responded, "Nothing is good about a 66," which caused audible laughter in the classroom.  In summary, the class was spent discussing a wide variety of topics, including: early morning hyperglycemia, diabetes, metabolic disease, titrating insulin, hyper/hypoglycemia, glycolysis, legal and ethical issues in nursing, hemostasis, Maslow's hierarchy of needs as it relates to being a nurse and their duties, patient self-esteem, and differences between an LPN and RN.

75.     **NWAOKWU** recommended to the participants they should absorb as much of the information as possible without getting frustrated.  It should be noted that during this class

**NWAOKWU** asked a student, "What are you most concerned about?" An unknown male patient responded, "I'm afraid of killing the patient," which caused the classroom to laugh out loud. **NWAOKWU** did little to address the student's concern before he moved to the next topic. Your affiant believes this statement encapsulates the situation. There is a classroom of 10 students who, based on the interaction and general disposition of the class, have no formal education but are being coached on how to pass a nursing board exam. In reviewing the recording, it became immediately obvious no one in the class had any knowledge, training, or experience in the medical field. **NWAOKWU** covered a broad range of topics in an unstructured format, he received little constructive interaction with the class, and appeared to get frustrated with their lack of effort and knowledge, while at the same time constantly cracking jokes. **NWAOKWU** himself does not have a National Provider Identifier (NPI) number. HIPAA provisions require all healthcare providers to have an NPI number, which is a unique, government-issued standard identification number for individual healthcare providers and provider organizations, such as clinics, hospitals, schools, and group practices. **NWAOKWU** is also not a registered RN or an LPN in Maryland or Virginia.

76.     After the class was over, CS1 met with **NWAOKWU** in his first-floor office located in an office building in Laurel, Maryland to receive his **Nursing School 2** diploma and transcripts. Your affiant took control of the records provided to CS1 by **NWAOKWU**. Your affiant is in possession of two copies of a **Nursing School 2** transcript, one purporting to be the official and the second a copy. The transcripts contain an "Official Signature and Seal" portion with what appears to be **NAPOLEON**'S signature. The transcript indicates CS1 attended the school from December 2017 through December 2019 and graduated with an associate's degree in

nursing.  Your affiant is also in possession of the illegitimate diploma with CS1's alias on it.  The diploma is signed by **NAPOLEON** with a graduation date of December 9, 2019.

77.      Your affiant verified on September 16, 2020 that the New York State Education Department received CS1's Form 2 and transcripts from the **Nursing School 2**.  Additionally, on September 17, 2020, the New York State Education Department received CS1's Form 1 and fee by standard mail.  Form 1 and the fee are initially mailed to a post office box controlled by KeyBank, where the fee is processed and electronically recorded in the New York State Education Department's mainframe system.  The form is then scanned and sent to the New York State's Office of Professions for processing.  New York State's Office of Professions rejected CS1's Form 1 due to "defective notarization," meaning CS1's signature was not dated next to the notarization.  CS1 was not present when his signature was notarized.  **NWAOKWU** handled the notarizing as part of the $17,000 fee.

### CS1 Travels to Florida to be Fingerprinted

78.      On October 28, 2020, **NWAOKWU** informed CS1 he would need to travel to Florida to be fingerprinted.  The New York Board of Nursing requires fingerprinting as part of the application process.  During the meeting **NWAOKWU** texted CS1 the information he needed for fingerprinting.  **NWAOKWU** directed CS1 to contact "Sebastien" at **"[Business 1]."**[10]  Also, **NWAOKWU** told CS1 that the fingerprinting would cost $95 plus tax for a total of $102.  The text message noted Business 1 was located at an identified address in Fort Lauderdale, Florida and Sebastien's phone number was provided.

---

[10] A google search of Business 1 resulted in identifying a website that confirmed the business address.

79.     "Sebastien" was identified as Individual C.  On November 12, 2020, CS1 conducted a recorded call to the phone number for Individual C to confirm his fingerprinting appointment on November 13, 2020, but the call was answered by "Roosevelt,"[11] who identified himself as Individual C's brother.  Roosevelt stated he would be responsible for picking up CS1 from the Fort Lauderdale airport and Individual C would be completing the fingerprinting.  When CS1 advised he was sent by **NWAOKWU,** Roosevelt said, "Oh, Dr. Patrick sent you? Beautiful, beautiful, beautiful."  Roosevelt went on to state that the New York Board of Nursing requires the fingerprinting to be completed and since the **Nursing School 2** was in Florida then the fingerprinting must be completed there too.

80.     At this point in the conversation the phone was transferred to a female who identified herself as **Geralda Adrien** ("**Adrien**").  **Adrien** advised she has been in the "school business for five years," and they do not disclose the cost of extra fees for things like fingerprinting because it is assumed individuals would understand that was part of the process.  **Adrien** stated Business 1 actually provides a discount to the "students" for the background check.  Transportation to and from the airport is an extra service they provide that must be paid for.  She went on to state, "We don't get paid from Dr. Patrick, but we do service the students because we are associated with the school."  **Adrien** stated she has "students as well.  You are coming to a school."[12]  She continued by stating, "I don't only do this service for Dr. Patrick, I do it for schools in New York, Texas, like everywhere.  It's like a network.  We are networking together."  **Adrien** then stated, "If you are Dr. Patrick's student then you'll probably be coming here for clinicals, if you need

---

[11] Roosevelt was later identified as Individual D.

[12] Research on the internet indicated Business 2 is located at another suite in the same address as Business 1.  **Adrien** is listed as the president and registered agent of Business 2, and her address is the same address, except for suite 14, which was the listed address for Business 1.

28

clinicals." She added, "We do this for many schools. We work for many schools." **Adrien** asked CS1, "Which board are you going to… New York?" Without letting CS1 answer, she added, "This is a requirement. When you go to take the test New York will have your fingerprint and picture, its coming from here." Finally, **Adrien** noted, "Usually Dr. Patrick has two or three of you guys coming together."

81.     A review of **NWAOKWU**'S bank records showed from July 2019 through May 2020 he sent **Adrien** nine checks for a total of more than $41,000. Additionally, from June 2019 through June 2020 there are twelve bank transfers from **NWAOKWU** to **Adrien** for more than $40,000. **NWAOKWU** also sent three checks to Individual C in 2020 for a total of $12,500.

82.     A review of two bank accounts controlled by **NWAOKWU** showed from June 2019 through June 2020 at least eighteen individuals either transferred money or wrote checks to **NWAOKWU** for more than $156,000. In many instances the memo of the line noted comments like "School Fees" or "School tuition." Your affiant believes each one of these individuals has either purchased or is in the process of purchasing a fraudulent LPN or RN degree in hopes of working in the health care field as soon as possible with no formal education.

83.     On November 13, 2020, CS1 flew from Maryland to Fort Lauderdale, FL. Upon his arrival, CS1 met with FBI agents who provided him with audio and video recording equipment for his drive to the fingerprinting appointment, the actual appointment, and back to the airport. CS1 was picked up at the airport by Roosevelt. During the drive to the fingerprinting appointment CS1 asked, "So you guys deal with Patrick's people?" Roosevelt responded, "Yes, yes, we have a lot of things going on with Dr. Patrick." Roosevelt also noted in the past he has picked up four or five of Dr. Patrick's students from the airport at the same time. When CS1 asked Roosevelt about **NAPOLEON** he responded, "Umm, yeah, you know we are in the same field, so we do

things together, we do a lot of things together."  CS1 asked Roosevelt if his "cousin," who resides in the Fort Lauderdale area, could also get a RN degree from him because it did not make sense for the cousin to travel to Maryland.  Roosevelt advised CS1 to speak with **Adrien**, but they can help and **Adrien** will be able to explain how.  Later in the drive Roosevelt stated the New York Board of Nursing is "picky and they pay attention to any little detail."  He stated they would question the location of the fingerprinting versus the location of the school.  If there is a difference it would be a red flag for the New York Board of Nursing, and you don't want to give them a reason to question anything.

84.     On the way back to the airport after the fingerprinting was complete Roosevelt confirmed **NAPOLEON** signs off on all the **Nursing School 2** certifications.  He also confirmed there are nursing "classes" held at the Business 1 location.

85.     Your affiant received records related to the **Nursing School 2** from the New York State Office of the Professions, the agency responsible for maintaining New York State nursing applications and active licenses.  In summary, at the time of the records response there were five individuals applying for their LPN license and none who received their license.  Further review of the records show there are 1226 **Nursing School 2** applicants applying for their license in New York.  Approximately 369 **Nursing School 2** graduates have received their license in New York.  New York is not part of the NLC, but licensed nurses from New York can apply to work in the state of Maryland through the Maryland Board of Nursing's Endorsement Department.

86.     Due to the covert nature of the investigation your affiant has not communicated with any employers of individuals who graduated from the **Nursing School 2.**  However, your affiant has verified at least four graduates have worked for health care entities that bill Medicare and Medicaid, and private insurance.

### March 2021: FBI Undercover Purchases Associate's Degree from
### Nursing School 2

87.     On March 17, 2021, CS1 conducted a consensually monitored phone call with **Adrien** with the intent of introducing an FBI undercover employee ("UCE") to **Adrien** for the purchase of a nursing degree from her.  **Adrien** agreed to meet with the UCE whenever he came to **Adrien's** office at **Business 1,** which is also located at the same building as Business 2, a business owned and operated by **Adrien**.  According to Business 2's public Facebook page they "offer CNA prep, HHA, Phlebotomy, EKG, CEU's, CPR. we also assist with renewals. we are with you every step of the way," and Business 2's purpose is to "empower men and women by helping them to become a health care provider."

88.     On March 18, 2021, the UCE met with **Adrien** at Business 2 and conducted a consensually monitored meeting with both audio and video equipment.  During the meeting, **Adrien** agreed to assist the UCE with purchasing an illegitimate nursing degree and preparing the UCE for the NCLEX.  **Adrien** explained to the UCE that a typical RN program consists of 22 months in school, or four years at a large university. **Adrien** further explained that she processes students by utilizing a school that is either on probation with the Board of Nursing or shut down, thus making it appear as though they attended the school for a given period of time.  **Adrien** emphasized that it was up to the UCE to actually pass the NCLEX, but explained that if the UCE purchased a nursing degree through **Adrien,** she would provide the UCE would a "review course" that she offers to help students "get the knowledge together" so that they can pass the nursing boards.

89.     **Adrien** expressed to the UCE that if the UCE was willing to move fast, and put down a deposit, **Adrien** would get the UCE's diploma from **Nursing School 2** which had already closed down and only had a few more available slots. Otherwise, the diploma would have to come

from the new nursing school, which would cost more money and take approximately three to four weeks to receive the documents. **Adrien** advised the degree will cost "16" and it will come from the **Nursing School 2**, a school that is already "closed down." Your affiant believes when **Adrien** told the UCE the degree would cost "16" she meant that cost of the illegitimate nursing degree is $16,000. **Adrien** recommended that UCE take the board exam in New York, as they allow for unlimited attempts. **Adrien** offered to fill out the UCE's application for the boards, and offered to complete two mandatory continuing education courses via [Business 3].com on the UCE's behalf.

90.     During this meeting, **Adrien** had the UCE complete the necessary applications and other documents as previously described with CS1. The UCE made a down payment of approximately $4,000, $100 plus the website's registration fee for **Adrien** to complete the required Business 3 online courses, and $10 for notarization. The fee also gave the UCE access to a WhatsApp group which holds audio recordings of all of the classes previously taught for NCLEX preparation. Additionally, every Wednesday **Adrien** teaches a "strategy" class on how to pass the NCLEX. **Adrien** stated to the UCE that someone with basic knowledge, participating in her strategy class, and self-confidence they could pass the NCLEX because it is all critical thinking. Adrien advised the UCE was getting an "associates degree" from a school that "was completely legit."

91.     On March 31, 2021, after being notified by **Adrien** that the documents were ready, the UCE conducted a consensually monitored meeting with **Adrien** to pay the balance of $12,000 to receive the diploma and transcripts from the **Nursing School 2**. The entire meeting was recorded with both audio and video equipment. The **Nursing School 2** diploma appears to be signed by **NAPOLEAN** with a graduation date of June 29, 2018. During the meeting, **Adrien** verified the diploma was signed by the school's "president" who is involved with this process and

who maintains a file for the UCE in case the Florida Board of Nursing requests records. Your affiant believes **Adrien** is referring to **NAPOLEON** because **NAPOLEON** is listed as the president and registered agent with the Florida Department of State. In addition, **Adrien** produced a fraudulent transcript, indicating that from June 27, 2016 through June 29, 2018, the UCE had completed approximately 72 credit hours and achieved a grade point average of 3.4.

92.     The UCE paid the remainder of the $16,000 fee in cash (a balance of approximately $12,000) and completed some additional paperwork. **Adrien** instructed the UCE to contact **Adrien** in three weeks following the submission of the background check so that **Adrien** could schedule the UCE to take the board exam.

93.     On or about April 8, 2021, the New York State Education Department received the UCE's application for licensure packet by mail. It included the application packet included the paperwork the UCE had completed with **Adrien** in March. It also included two continuing education certifications from Business 3 dated March 18, 2021 (the same date that the UCE met with **Adrien**) falsely certifying that the UCE had completed two continuing education courses.

## Conclusion

94.     Based on the foregoing, your affiant submits there is probable cause to believe from at least October 2016 to the present, in the District of Maryland and elsewhere, **NWAOKWU, BANGURA,** and **NAPOLEON** have committed the following offenses: conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit false statements relating to health care matters, in violation of 18 U.S.C. § 371; and false statements relating to health care matters, in violation of 18 U.S.C. § 1035. Accordingly, your affiant respectfully requests that criminal complaints and arrest warrants be issued.

Daniel Rzepecki, Special Agent
Federal Bureau of Investigation
Department of Justice


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this _____8th_____ day of July, 2021.

The Honorable Timothy J. Sullivan
United States Magistrate Judge

34